## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

**JUAN OLIVO, ANA J. OLIVO and**
**CATHERINE SOBERS**

*On Their Behalf and on Behalf of a Class of*
*Persons Similarly Situated*

                    Plaintiffs,

v.

**WELLS FARGO BANK, NA**                    Case No.

                Defendant.           **CLASS ACTION COMPLAINT**

                                              **Demand for Jury Trial**

## CLASS ACTION COMPLAINT

Plaintiffs JUAN OLIVO, ANA J. OLIVO (the "Olivos") and CATHERINE SOBERS ("Ms. Sobers") (combined "Named Plaintiffs" or "Plaintiffs"), through their undersigned counsel file this Class Action Complaint and Request for Jury Demand and say in support:

### I.  INTRODUCTION

1. The underlying matter involves just two of thousands of other similar situations across the State where homeowners are (i) seeking to change and modify their current mortgage loans without requesting any additional advances, (ii) complying with all requests of their servicer/lender in making the requests, but (iii) all their reasonable request are denied unjustifiably through misrepresentations, and the homeowners are left with no other option but to seek the assistance of the courts.

2.  These claims concern the utter failure of the Defendant Wells Fargo Bank, NA ("Wells Fargo" or "Defendant") to comply with Federal and New York law related to Plaintiffs' reasonable and appropriate requests to modify the terms of their mortgage loans subject to this action.

3.  Many, but not all, New York homeowners facing foreclosure have reasonable and sustainable solutions to their mortgage situation. Plaintiffs the Olivos and Ms. Sobers do have a sustainable solution, yet the Defendant, by and through its authorized agents, threatened wrongful foreclosure on the Olivos and Ms. Sobers, in the same way it is similarly treating the Class (defined in ¶ 72 below).

4.  Further, if the Defendant and its authorized agents proceed to foreclosure sale of the Olivos and Sobers homes, as well as foreclosure against the Class members' home and property without having complied with Federal and New York law or responding in good faith to Plaintiffs' requests for modification, The Olivos, Ms. Sobers and the Class will sustain significantly greater damages and losses as a result through further loss of equity in their homes and emotional damages as a result of these proceedings and the Defendant's illegal actions (directly and indirectly through its authorized agents and affiliates).

## II.  THE PARTIES

5.  Plaintiffs Juan Olivo, Ana J. Olivo (the "Olivos") are individual residents of Richmond County, New York and reside at 96 Queen Street, Staten Island, NY 10314 (the "Olivo Property").

6.  Plaintiff Catherine Sobers ("Ms. Sobers") is an individual resident of Queens County, New York and resides at 114-09 207th Street, Cambria Heights, NY 11411 (the "Sobers Property").

7.  Defendant Wells Fargo Bank, N.A. is a National Association with its principal executive offices at 101 North Phillips Avenue Sioux Falls, South Dakota. Wells Fargo Bank, N.A. also does business as Wells Fargo Home Mortgage.

## III.  JURISDICTION

7.  This Court has jurisdiction and venue of the matters asserted herein.  Jurisdiction is
appropriate for the following reasons:

    a.  On the basis of diversity of citizenship and in light of the amount in controversy is in
excess of $75,000 exclusive of costs. 28 U.S.C. § 1332;

    b.  The matters asserted herein present federal questions.  28 U.S.C. § 1331 and the court
has jurisdiction over any non-federal question claims under 28 U.S.C. § 1367; and

    c.  Pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. Sections 1332(d), 1453,
and 1711-1715 since the amount in controversy exceeds $5,000,000 and the members
of the Plaintiffs' class are citizens of a state different from the Defendant.

8.  Declaratory and injunctive relief are available pursuant to 28 U.S.C. §§ 2201 and 2202,
NY CPLR § 3001, and Fed. R. Civ. P. 23.

9.  Venue in this District is proper in that the Defendant transacts business within the District
and the conduct complained of occurred in the District.

## IV.  FACTS

10. Over the last several years, New York and, indeed, much of the United States have been in a
foreclosure crisis. Recent news reports have established that one in ten American homes is at
risk of foreclosure.

**Background on Ms. Olivo's Mortgage Loan Subject to this Action**

20. The Olivos are the owners of the Olivo Property. They purchased the Property on or about May
11, 2006.

21. The Olivos struggled to pay their $4,452.40 mortgage payment into 2008 as a result of a
reduction of household income from Mr. Olivo's employment.

22. In an effort to be proactive and responsible homeowners, Mr. Olivo on behalf of himself and his wife, contacted Wells Fargo to seek a modification in early 2008. After many phone calls and sending requested documents to Defendant, the Olivos were told that they would need to stop making payments in order to obtain a loan modification. After being told to stop making payments by the Defendant, the Olivos stopped making their payments and continued to petition Defendant for a loan modification.

23. Defendant never granted the Olivos a loan modification and instead commenced a foreclosure action in the New York State Supreme court in Richmond County under Index: 103005/2008 (the "Olivo Foreclosure Action"). Said action is still open and active and there is a foreclosure auction scheduled for June 7, 2018

24.  Throughout the pendency of the Olivo Foreclosure Action the Olivos have completed and submitted more than a dozen modification applications to Wells Fargo but have never been granted a loan modification. Wells Fargo's reason's for denial have been a moving target and changed over time depending on the programs that were available.

25. As a result of Wells Fargo's intransigence, the Olivos were forced into bankruptcy to protect the Property and on October 2, 2015, Plaintiff Ana Olivo filed a Chapter 7 bankruptcy petition in the Eastern District of New York under case number 1-15-44518.

26. During the pendency of the Chapter 7 bankruptcy case Ms. Olivo made an application for loss mitigation and again applied for a loan modification by submitting a complete application to Wells Fargo.

27. Yet again Wells Fargo refused to modify the Olivo mortgage this time claiming that the Pooling and Servicing Agreement (the "PSA") governs the Trust (which this loan is an asset of) prohibits the modification of the Olivo's mortgage.

20. Specifically, Wells Fargo cited ¶ 3.05 of the PSA for the proposition that they could not modify the Olivo mortgage. Section 3.05 of the PSA reads as follows:

Section 3.05 Collection of Mortgage Loans.  (b) Consistent with the foregoing, in instances when a Non-Designated Mortgage Loan is in default or default is reasonably foreseeable (within the meaning of the REMIC Provisions), and if in the related Servicer's determination, in accordance with Accepted Servicing Practices, such modification is not materially adverse to the interests of the Certificateholders (taking into account any estimated Realized Loss that might result absent such action), the related Servicer may modify the terms of such Non-Designated Mortgage Loan to (1) capitalize to the principal balance of such Non-Designated Mortgage Loan unreimbursed Monthly Advances, unreimbursed Servicing Advances, unpaid Servicing Fees, and related amounts due to the related Servicer; (2) defer such amounts to a balloon payment due on the final payment date of such Non-Designated Mortgage Loan; (3)  extend the maturity of any such Non-Designated Mortgage Loan, but in no instance past the date on which the final payment is due on the latest maturing Mortgage Loan in the related Loan Group as of the Cut-off Date; and/or (4) reduce the related Mortgage Rate (provided that *the Mortgage Rate of any fixed-rate Mortgage Loan may not be reduced, and the Mortgage Rate of any adjustable rate Mortgage Loan may not be reduced below the Mortgage Rate of such Mortgage Loan immediately prior to the related first adjustment date*)

21. Upon information and belief Wells Fargo is misrepresenting the restrictions that apply to the Olivo loan. The Olivos have now become aware that Wells Fargo has in fact modified other mortgages governed by the same exact PSA in a manner inconsistent with their representations as outlined in documents filed with the United States Securities and Exchange Commission.

22. In this case, an affordable loan modification was possible using HAMP parameters. Parameters which Wells Fargo claimed that it could not abide by because of restrictions, such as interest rate reductions and principal capitalization (both of which it now appears have been done on numerous occasions with loans governed by the PSA).

23. Wells Fargo received billions of dollars in Troubled Asset Relief Program ("TARP") bailout funds and contracted with the United States Treasury Department to participate in HAMP. The agreements that Wells Fargo entered into with the United States Department of Treasury were drafted and entered into long after the pooling and servicing agreement that the Wells Fargo used to deny the Olivos a loan modification.

24. Wells Fargo illegally misrepresented the restrictions governing the servicing of the Olivo mortgage and ran out the clock on HAMP which expired on December 31, 2016, thereby improperly denying the Olivos the opportunity to save their home through HAMP which was available from April of 2009 through December 31, 2016.

25. Upon information and belief, there are more agreements that govern the servicing of loans in this securitized Trust such as the agreements defined as follows in the PSA under a section entitled as follows:

> "Designated Servicing Agreements:  Each of the Chevy Chase Servicing Agreement, the Countrywide Servicing Agreement, the First Horizon Servicing Agreement, the GMAC Servicing Agreement, the IndyMac Servicing Agreement, the SunTrust Servicing Agreement and the Wachovia Servicing Agreement, as applicable.". The creditor in this case has not produced such a servicing agreement."

26. Upon information and belief, with regards to this Trust, Wells Fargo entered into a Reconstituted Servicing Agreement dated September 1, 2006 which may have been amended and/or modified multiple times since its inception, including amendments to allow for participation in HAMP and changes to the mortgage loans that alter the terms of the Pooling and Servicing Agreement. The Olivos have requested copies of those agreements but Wells Fargo has absolutely refused to provide said agreements for the Olivo's review.

27. Upon information and belief, Wells Fargo had numerous programs available that could have modified the Olivo Mortgage. Said programs and the information regarding said programs have been withheld from the Olivos and Class members.

28. After many, many days, weeks, months and hours of searching publicly available information regarding the pool of loans governed by the PSA under the Trust that holds the Olivo mortgage known as CSMC Mortgage-Backed Pass-Through Certificates Series 2006-9, it has now become apparent that Wells Fargo has misrepresented relevant information regarding restrictions that govern the pool of loans.

29. Upon information and belief there is evidence in the form of Remittance Reports and Loan Modification Reports that show a substantial number of loans in the pool of loans known as CSMC Mortgage-Backed Pass-Through Certificates Series 2006-9 have in fact been modified by reducing the interest rate down to 2% (below the original rate of the notes), contrary to Wells Fargo's contentions and representations. Upon information and belief, these loans were modified under HAMP. At a time when Wells Fargo was telling the Olivos that HAMP was not available due to restrictions in the PSA.

30. Upon information and belief, the loans listed below which are governed by the PSA, appear to have had a capitalization of principal and interest, interest rate reductions and even principal forgiveness that are outside of the parameters that Wells Fargo referenced in the pooling and servicing agreement at paragraph 3.05:

| | | | |
|---|---|---|---|
| 0408341892 | 0408342244 | 0408342255 | 0408342086 |
| 0408342094 | 0408342112 | 0408342190 | 0408342216 |
| 0408342235 | 0408342387 | 0407750169 | 0408350473 |

31. Without listing the details of each of loans listed, the Olivos will prove to this Court that loan # 0408350473 was granted a principal reduction in the amount of $358,730.55, loan # 0408341892 was granted an interest rate reduction from 6.37% down to 2% along with a capitalization of principal in the amount of $205,629.54.

32. There is much more information to support the Olivo's contention that Wells Fargo has purposefully misrepresented the restrictions that govern the servicing of the loans in the Trust, and in so doing have *inter alia*, committed fraud and irreparably harmed the Olivo Plaintiff's and other Members of the Class by improperly denying the loan modification applications at a time when Wells Fargo was modifying the mortgages of similarly situated persons under terms other than the restrictions they cited to deny the loan modification applications of the Olivo Plaintiff's and other Class Members.

33.  Upon information and belief, it seems clear from the Remittance Reports that Wells Fargo did modify loans outside the restrictions that they claimed prevent them from modifying the Olivo loan and other Class Member loans.

34. Upon information and belief, the Remittance Report shows a large amount of principal forgiveness overall in the pool of modified loans in the Trust. The Remittance Report contains a section labeled "Modified Data Elements", which shows that pre-modification balances on modified loans totaled $63,867,475.00 and $61,095,617.63 post modification. ***This data proves that more than $2,771,858.00 in principal was forgiven on modified loans I the pool of loans that contains the Olivo loan.*** This is something that Wells Fargo has steadfastly represented to Olivo and other Class Members that it is restricted from doing. This is a purposeful misrepresentation which amounts, *inter alia*, to fraud.

35. Upon information and belief, Wells Fargo has in fact modified loans in the pool of loans in the Trust on terms outside of the restrictions outlined in paragraph 3.05 of the PSA, and has purposefully misrepresented those restrictions to the Olivos and other Members of the Class.

36. New York State law and Federal law require mortgagees to participate in loss mitigation efforts in "good faith".  Good Faith means earnest efforts towards finding a mutually agreeable compromise.  The Olivo Plaintiffs on their own behalf and on behalf of the Class Members will show that Wells Fargo's purposeful misrepresentations were not in Good Faith and in fact violated New York State law and Federal law, and in so doing have caused irreparable harm to the Plaintiff's and Class Members.

37. Additionally, the Plaintiffs have been harmed in their reliance on the misrepresentations made by Defendant because they believed said misrepresentations and in so doing believed that they could not obtain a loan modification and as a result untold amounts of interest accrued and drastically changed the Plaintiff's positions and amounts owed on their mortgages.

**Background on Ms. Sobers Mortgage Loan Subject to this Action**

38. Plaintiff Catherine Sobers is the owner of the Sobers Property. She purchased the Property on or about July 26, 2006.

39. Catherine Sobers struggled to pay her $2,764.13 mortgage payment into 2008 as a result of a reduction of household income from Ms. Sobers' employment, due to surgery of a personal nature which kept her bed ridden for 2 months.

40. In an effort to be a proactive and responsible homeowner, Ms. Sobers, contacted Wells Fargo to seek a modification in early 2008. After many phone calls and sending requested documents to Defendant, Ms. Sobers was told that she had been granted a loan modification with 3 trial payments in the amount of $2,375.74 and that once she had made the three (3) trial payments her loan would be permanently modified.

41. Ms. Sobers made the three (3) trial payments in September, October and November of 2009 and was told by Wells Fargo employees that she would be receiving a loan modification shortly. Unfortunately and inexplicably, Wells Fargo never permanently modified Ms. Sobers mortgage.

42. Ms. Sobers submitted numerous loan modification applications in the years thereafter and on April 23, 2013 the Trust that Wells Fargo is servicing the loan on behalf of commenced a foreclosure action in the New York State Supreme court in Queens County under Index: 8084/2013 (the "Sobers Foreclosure Action"). Said action is still open and active and there was a foreclosure auction scheduled for March 24, 2017.

43. Throughout the pendency of the Sobers Foreclosure Action, Sobers has completed and submitted more than a half a dozen modification applications to Wells Fargo but has never been granted a loan modification. Wells Fargo's reasons for denial have been a moving target and changed over time depending on the programs that were purportedly available.

44. As a result of Wells Fargo's intransigence, Sobers was forced into bankruptcy to protect the Property and on March 23, 2017 (the eve of the foreclosure auction), Plaintiff Catherine Sobers filed a Chapter 13 bankruptcy petition in the Eastern District of New York under case number 1-17-41342.

45. During the pendency of the Chapter 13 bankruptcy case Ms. Sobers made an application for loss mitigation and again applied for a loan modification by submitting a complete application to Wells Fargo.

46. Yet again Wells Fargo refused to modify the Sobers mortgage this time claiming that there are restrictions that prohibit the modification of the Sobers mortgage. Specifically, Wells Fargo claims that they can only do a "piggy-back modification" with 12 payments or less being capitalized or "piggy-backed" onto the balance of the loan and that any balance beyond the 12 months of payments would need to be paid in the form of a borrower's cash contribution.

47.  Upon information and belief, the Sobers loan is similar to the Olivo's loan in that it is pooled with thousands of other mortgages into a Trust in which Wells Fargo acts as the servicer.

48.  Upon information and belief, the servicing of the Sobers loan is governed by a Pooling and Servicing Agreement (the "PSA") which refers to an attached Servicing Agreement which states at Section 3.1.2

> "3.1.2. Modifications of Mortgage. With the prior written consent of the Master Servicer, the Servicer may modify the terms of a Mortgage Loan which is in default or a Mortgage Loan as to which default is reasonably foreseeable; provided, however, that (i) such modification may not reduce the amount of principal owed under the related Mortgage Note or permanently reduce the Mortgage Interest Rate for such Mortgage Loan and (ii) the Servicer and the Master Servicer have determined that such modification is likely to increase the proceeds of such Mortgage Loan over the amount expected to be collected pursuant to foreclosure. Notwithstanding anything to the contrary in this Agreement, the Servicer shall not permit any modification of any material term of a Mortgage Loan (including the Mortgage Interest Rate, the principal balance, the amortization schedule, or any other term affecting the amount or timing of payments on the Mortgage Loan) where such modification is not the result of a

default or as to which default is reasonably foreseeable under the Mortgage Loan
unless the Master Servicer has consented thereto and the Servicer has received
an Opinion of Counsel or a ruling from the Internal Revenue Service (at the
expense of the Servicer or the party making the request of the Servicer to
modify the Mortgage Loan) to the effect that such modification would not be
treated as giving rise to a new debt instrument for federal income tax purposes
or a disposition of the modified Mortgage Loan and that such modification is
permitted under the REMIC Provisions."

49. Upon information and belief, the words "Piggy-Back", "Piggy Back", and "Piggy" do not
appear in the PSA or Servicing Agreement.

50. Upon information and belief, nothing in the PSA or Servicing Agreement prohibits Wells Fargo
from modifying the Sobers mortgage.

51. In this case, an affordable loan modification has always been possible using parameters which
the Creditor claims that it cannot abide by because of restrictions, such as interest rate
reductions and principal capitalization (both of which it now appears have been done on
numerous occasions with loans in this Trust).

52. Wells Fargo received billions of dollars in TARP bailout funds and contracted with the United
States Treasury Department to participate in many loan modification programs. And now they
seek to squirm out of their obligation by reference to cryptic language.

53. Upon information and belief, Wells Fargo entered into agreements with the United States
Department of Treasury long after the pooling and servicing agreement.

54. Upon information and belief, Wells Fargo's servicing of the Sobers loan is governed by other
agreements, such as Designated Agreements, Reconstituted Servicing Agreements, Servicer
Participation Agreements, Consent Orders and more.

55. Upon information and belief, Wells Fargo is misrepresenting the restrictions that apply to the
Sobers loan. Ms. Sobers has now become aware that Wells Fargo has in fact modified other
mortgages governed by the same exact PSA as outlined in documents filed with the United

States Securities and Exchange Commission, in a manner inconsistent with Wells Fargo's representations.

56. In this case, an affordable loan modification was possible using HAMP parameters. Parameters which Wells Fargo claimed that it could not abide by because of restrictions, such as interest rate reductions and principal capitalization (both of which it now appears have been done on numerous occasions with loans governed by the PSA).

57. Wells Fargo received billions of dollars in Troubled Asset Relief Program ("TARP") bailout funds and contracted with the United States Treasury Department to participate in HAMP. The agreements that Wells Fargo entered into with the United States Department of Treasury were drafted and entered into long after the pooling and servicing agreement that the Wells Fargo used to deny Ms. Sobers a loan modification.

58.  Wells Fargo illegally misrepresented the restrictions governing the servicing of the Sobers mortgage and ran out the clock on HAMP which expired on December 31, 2016, thereby improperly denying Ms. Sobers the opportunity to save her home through HAMP which was available from April of 2009 through December 31, 2016.

59. Upon information and belief, Wells Fargo had numerous programs available that could have modified the Sobers mortgage. Said programs and the information regarding said programs have been withheld from Ms. Sobers and Class members.

60. After many, many days, weeks, months and hours of searching publicly available information regarding the pool of loans governed by the PSA under the Trust that holds the Sobers Mortgage known as Wells Fargo Asset Securities Corporation Mortgage Pass-Through Certificates Series 2006-15, it has now become apparent that Wells Fargo has misrepresented relevant information regarding restrictions that govern the pool of loans.

61. Upon information and belief there is evidence that a substantial number of loans in the pool of loans known as Wells Fargo Asset Securities Corporation Mortgage Pass-Through Certificates,

Series 2006-15 (hereinafter "WFASC Series 2006-15" or "Trust" or "Sobers Trust") have been modified by reducing the interest rate down to 2% (below the original rate of the notes).

62. Upon information and belief, many of the loans in the Trust have been modified under HAMP.

63. Upon information and belief. many of the loans in the Trust have been modified using interest rate reductions, capitalization of principal and interest, and even principal forgiveness.

64. Upon information and belief. there is evidence in the form of Remittance Reports and Loan Modification Reports that show a substantial number of loans in the pool of loans known as Wells Fargo Asset Securities Corporation Mortgage Pass-Through Certificates Series 2006-15 have in fact been modified by reducing the interest rate down to 2% (below the original rate of the notes), contrary to Wells Fargo's contentions and representations. Upon information and belief, these loans were modified under HAMP. At a time when Wells Fargo was representing to Ms. Sobers, and other Class Members that HAMP was not available due to restrictions in the PSA.

65. Without listing the details of each of loans in said reports, Ms. Sobers will prove to this Court that the Trust contains loans which were modified under terms substantially different that the terms that Wells Fargo used to deny Ms. Sobers and other Class Members loan modification applications.

66. There is much more information to support Ms. Sobers contention that Wells Fargo has purposefully misrepresented the restrictions that govern the servicing of the loans in the Trust, and in so doing have *inter alia*, committed fraud and irreparably harmed the Sobers Plaintiff and other Members of the Class by improperly denying the loan modification applications at a time when Wells Fargo was modifying the mortgages of similarly situated persons under terms other than the restrictions they cited to deny the loan modification applications of the Sobers Plaintiff and other Class Members.

67.  Upon information and belief, it seems clear from the Remittance Reports that Wells Fargo did modify loans outside the restrictions that they claimed prevent them from modifying the Sobers loan and other Class Member loans.

68. Upon information and belief, the Remittance Report shows a large amount of principal forgiveness overall in the pool of modified loans in the Trust. The Remittance Report contains a section labeled "Principal Distribution Statement", which contains a column labeled "Total Principal Reduction". ***This data proves that $10,469,055.60 in principal was forgiven on modified loans in the pool of loans that contains the Sobers loan.*** This is something that Wells Fargo has steadfastly represented to Sobers and other Class Members that it is restricted from doing. This is a purposeful misrepresentation which amounts, *inter alia*, to fraud.

69. Upon information and belief, Wells Fargo has in fact modified loans in the pool of loans in the Trust on terms outside of the restrictions that it has told Sobers and other Class Members it must adhere to.

70. New York State law and Federal law require mortgagees to participate in loss mitigation efforts in "good faith".  Good Faith means earnest efforts towards finding a mutually agreeable compromise.  The Olivo Plaintiff's on their own behalf and on behalf of the Class Members will show that Wells Fargo's purposeful misrepresentations were not in Good Faith and in fact violated New York State law and Federal law, and in so doing have caused irreparable harm to the Plaintiff's and Class Members.

71. Additionally, the Plaintiffs have been harmed in their reliance on the misrepresentations made by Defendant because they believed said misrepresentations and in so doing believed that they could not obtain a loan modification and as a result of that reliance, untold amounts of interest accrued and drastically changed the Plaintiff's positions and amounts owed on their mortgages.

**Plaintiffs' Class Definition**

72. This class action is brought by Mr. & Mrs. Olivo and Catherine Sobers on behalf of themselves and a Plaintiffs' Class of all New York homeowners whose mortgage loans (i) have been serviced by Wells Fargo and (ii) since three years proceeding this action have sought to change the terms of their existing mortgage without requesting additional advances or credit; and (iii) have received denial of their request for modification or change in terms based on false and misleading information and (iv) have been subject to a foreclosure action or threat of foreclosure by Wells Fargo (hereinafter "Plaintiffs' Class").

**Facts Common to the Plaintiffs' Class**

73. Named Plaintiffs sue on their own behalf and on behalf of a Class of persons under Fed. Rule. Civ. Pro. 23.

74. Named Plaintiffs do not know the exact size or identities of the proposed Class, since most of the information is in the exclusive control of Defendant. Certain information may be reported by the Defendant to the State of New York and may also be part of the public records. Named Plaintiffs believe that the Class encompasses many hundreds of individuals and whose identities can be readily ascertained from Wells Fargo's books and records as well as public records.  Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

75. Named Plaintiffs believe the amount in controversy is more than $5 million.

76. All members of the Class have been subject to and affected by the same conduct. The claims are based on Wells Fargo's standard policies and practices that employ standard form letters, contracts and uniform loan modification processing requirements.  There are also questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the class.  These questions include, but are not limited to the following:

a.  the nature, scope and operation of Wells Fargo's obligations to homeowners under its mortgage modification programs;

b.  whether Wells Fargo's threat, referral to or prosecution of a foreclosure or foreclosure sale/action while simultaneously considering a borrower for a modification amounts to a breach of contract and/or a breach of its duty of good faith and fair dealing to the Class and constitutes an unfair and deceptive practice or misrepresentation or omission under New York law

c.  whether Wells Fargo's misrepresentations in their denial to the Class requests for a change in the terms of their existing credit without request for additional advances is a violation of Wells Fargo's duty of good faith and fair dealing to the Class;

d.  whether Wells Fargo's conduct violates the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 e*t seq.* and state law requirements relating to Equal Credit;

e.  whether Wells Fargo's conduct violates the New York UCC*;*

f.  whether Wells Fargo's conduct violates the Federal UCC*;*

g.  whether Wells Fargo's conduct rises to the level of Fraud under Federal and/or State Law*;*

h.  whether there are more than 50 borrowers who are members of the Class;

i.  whether Wells Fargo should be enjoined from continuing to pursue foreclosure actions, directly or indirectly, in New York concerning borrowers who have requested a mortgage modification of their existing credit arrangement without seeking additional credit but whom they have not received a truthful specific, accurate and timely written denial from Wells Fargo;

j.  the attorney fees, litigation costs, and court costs allowed and claimed in this civil action;

k.    the declaratory relief sought in this civil action; and

l.    The injunctive relief sought in this civil action.

77.   The claims of the Named Plaintiffs are typical of the claims of the class and do not conflict with
the interests of any other members of the Class that both the Named Plaintiffs and the other
members of the Plaintiffs Class were subject to the same conduct, same modification
procedures by Wells Fargo, and were met with the same misrepresentations in response to
applications for a change in mortgage terms without an extension of additional advances and/or
subject to or threatened with foreclosure before a modification had been denied or even
completed in writing.

78.   Named Plaintiffs are similarly situated with and has suffered similar damages as the other
members of the Class as described herein.

79.   The Named Plaintiffs will fairly and adequately represent the interests of the Class. Each are
committed to the vigorous prosecution of the class claims and has retained attorneys who are
qualified to pursue this litigation and have substantial experience in foreclosures, loss
mitigation inside the courts at the state level and the federal level. Named Plaintiffs has no
interests adverse to the Class.

80.   A class action is superior to other methods for the fast and efficient adjudication of this
controversy.  A class action regarding the issues in this case does not create any problems of
manageability.

81.   This putative class action meets all of the requirements of Fed. Rule. Civ. Pro. 23.

82.   Wells Fargo has acted or refused to act on grounds that apply generally to the Class so that final
injunctive relief or corresponding declaratory relief is appropriate respecting the class as a
whole.

83.   It would not be economically feasible for each of the individual Class members to maintain similar claims since many of them have already suffered financial setbacks.

84.   The damages of each individual Class members can be calculated using the same common formulas.

85.   Failure to join the claims of each individual claimant into class claims would lead to duplicate claims/litigation involving the same issues and facts, excessive costs and fees, burdens and potentially inconsistent outcomes.

86.   The common issues set forth above predominate and asserting the claims on a class basis is superior to the alternative of individual actions.

87.   The Class had no reason to know of the true illegal nature of the illegal acts of the Defendant concerning the responses to their mortgage loan modification requests since the Defendant routinely omits or misrepresents certain required information from the Class concerning the status of the hundreds of modification requests made to them during the class period.

88.   This case is one of those rare instances where circumstances external to the conduct of the Class which warrant a finding that it would be unconscionable to enforce the various federal and state limitations periods against the Class since such an act would create a gross injustice of allowing the Defendant to wrongfully and unjustly enriched to the detriment of the Class in the millions of dollars.

89.   This matter is an extraordinary circumstance at the core of the economic troubles related to the housing crisis that is beyond the control of the Class and Named Plaintiffs who trusted that licensed mortgage professionals and national banks, including the Defendant, would comply with the law.  Because the Defendant misrepresented the parameters of their loan modification programs, the Class had no reason to investigate further on their own.

## COUNT I – DEFENDANT HAS BREACHED ITS IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING UNDER NEW YORK'S UCC
### (Individual and Class Claim)

90. Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as though set forth fully and at length herein, and adds:

91. NY CLS UCC § 1-201 (20) provides that ""Good faith" means honesty in fact in the transaction or conduct concerned."

92. The definition of "good faith" in this section requires not only honesty in fact but also "observance of reasonable commercial standards of fair dealing." Although "fair dealing" is a broad term that must be defined in context, it is clear that it is concerned with the fairness of conduct rather than the care with which an act is performed. This is an entirely different concept than whether a party exercised ordinary care in conducting a transaction. Both concepts are to be determined in the light of reasonable commercial standards, but those standards in each case are directed to different aspects of commercial conduct.

93. It is black letter law that "good faith and fair dealing are presumed in every contract. E.g., Integrated Sales, Inc. v. Maxell Corp. of America, 94 A.D.2d 221, 226, 463 N.Y.S.2d 809, 812 (1st Dep't 1983). "A party's actions may implicate the implied [U.C.C.] covenant of good faith when it acts so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties." *Bank of China v. Chan,* 937 F.2d 780, 789 (2d Cir. 1991). *Fleet Capital Corp. v. Yamaha Motor Corp*., U.S.A., 2002 U.S. Dist. LEXIS 18115, *126, 48 U.C.C. Rep. Serv. 2d (Callaghan) 1137, 2002 WL 32063614

94. The tort of breaching an implied covenant of good faith and fair dealing consists in bad faith action, extraneous to the contract, with the motive intentionally to frustrate the obligee's enjoyment of contract rights.

95.    Here, Defendant has purposefully misrepresented the terms under which it can modify the Plaintiffs' mortgages and in so doing has breached the implied covenant of good faith and fair dealing between the Parties.

**WHEREFORE**, Named Plaintiffs pray this Court will issue an Order entering judgment against Wells Fargo Bank, N.A. for violating NY UCC awarding Plaintiffs statutory damages, actual damages, costs and reasonable attorney's fees; and any further relief this Court deems appropriate.

## COUNT II – DEFENDANT HAS BREACHED ITS IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING UNDER FEDERAL UCC
### (Individual and Class Claim)

96.    Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as though set forth fully and at length herein, and adds:

97.    U.C.C. § 1-201 provides the following definition "Good faith," except as otherwise provided in Article 5, means honesty in fact and the observance of reasonable commercial standards of fair dealing."

98.    Under Federal Law, the duty of good faith and fair dealing is part of every contract unless it is expressly excluded. See Northwest, Inc. v. Ginsberg, -- U.S. ----, 134 S. Ct. 1422, 1431-32 (2014); Metcalf Constr. Co. v. United States, 742 F.3d 984, 990 (Fed. Cir. 2014).

99.    The U.C.C. was promulgated by the National Conference of Commissioners on Uniform State Laws and the American Law Institute in 1951. U.C.C. xv (2005). The original version of the U.C.C. had three general sections relating to good faith. U.C.C. app. xviii §§ 1-201(19) (defining good faith: "'Good faith' means honesty in fact in the conduct or transaction concerned."); 1-203 (stating an obligation of good faith: "Every contract or duty within this Act imposes an obligation of good faith in its performance and enforcement."); 2-103(1)(b)

(defining good faith for purposes of Article 2: "'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade).

100. Article 1 of the U.C.C. was revised in 2001. The revision changed the definition of good faith (except for purposes of Article 5) to "honesty in fact and the observance of reasonable commercial standards of fair dealing." U.C.C. § 1-201 (2004). The 2001 revision also modified the statement of the obligation of good faith-"Every contract or duty within [the Uniform Commercial Code] imposes an obligation of good faith in its performance and enforcement." Id. § 1-304. Article 2 of the U.C.C. was amended in 2003 to remove the special definition of good faith for purposes of Article 2, except that for jurisdictions adopting the amended Article 2 that had not adopted the revised Article 1, amended Article 2 contains the same definition of good faith that is incorporated into revised Article 1. Id. app. xx § 2-103(j).

101. Here, Defendant has purposefully misrepresented the terms under which it can modify the Plaintiffs' mortgages and in so doing has breached the implied covenant of good faith and fair dealing between the Parties.

*WHEREFORE*, Named Plaintiffs pray this Court will issue an Order entering judgment against Wells Fargo Bank, N.A. for violating the Federal UCC pursuant to 15 USC § 1640; statutory damages, actual damages, costs and reasonable attorney's fees; and any further relief this Court deems appropriate.

## COUNT III – COMMON LAW FRAUD CLAIM UNDER NEW YORK LAW
(Individual and Class Claim)

102. Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as though set forth fully and at length herein, and adds:

103. The elements of a fraud claim are 1) the making of a statement, 2) the falsity of the statement, 3) an intent to deceive, called "scienter", 4) reasonable reliance on the statement by the injured party, and 5) injury sustained as the result of the reliance.

104. Here, Wells Fargo has provided numerous written statements outlining reasons for denying the Class Members loan modification applications.

105. Here, Wells Fargo's written statements were false and misleading as to the purported restrictions that prevented modification of the Class Members mortgages. As more fully outlined in this Complaint, Wells Fargo has modified mortgages governed by the same governing documents that it claims restrict the manner in which it can modify a Class Member's mortgage. Upon information and belief, Wells Fargo has purposefully misrepresented the "restrictions" and failed to disclose governing documents that actually permit modification of the Class Member's mortgages.

106. Here, each of the Class Members relied on Wells Fargo's misrepresentations along with Wells's Fargo's acceleration of the entire debt and the resulting cessation of the Class Members rights to make monthly installment payments thereafter. Here, Class Members by applying for loan modifications demonstrated that they were ready, willing and able to resume making monthly payments, but Class members were prevented from doing so, while the interest, fees and escrow balance continued to accrue while Wells Fargo misrepresented the "restrictions" to the Class Members.

107. As a result of Wells Fargo's misrepresentations, the Class members have been injured by loss of equity and accrual of interest, fees and escrow balances.

108. Class Members have been injured by Wells Fargo's delays which have prolonged the amount of time that their mortgages are reported late on their credit reports thereby preventing the Class Members from being able to solve their problems and move on with their lives.

109. Class Members have been injured by the torment and mental anguish resulting from the prolonged threat of losing their homes, when in reality a viable loan modification solution was always available but for Wells Fargo's misrepresentations.

110. Here, Defendant has purposefully and knowingly misrepresented the terms under which it can modify the Plaintiffs' mortgages, without Plaintiffs' knowledge, which is a material misrepresentation, with the intent to cause Plaintiffs to act on said misrepresentation, which the Plaintiffs rightfully relied upon to their detriment in the form of late fees, attorneys' fees, an increased principal balance on the mortgages and accrued interest thereon, and the loss of equity resulting from the fraudulent conduct of Defendant.

**WHEREFORE**, Named Plaintiffs pray this Court will issue an order granting a judgment against Wells Fargo Bank, N.A. for its fraudulent misrepresentations, awarding Plaintiffs actual and statutory damages, exemplary and punitive damages, attorney's fees and costs and injunctive relief; and any further relief this Court deems appropriate.

## COUNT IV – COMMON LAW FRAUD CLAIM UNDER FEDERAL LAW
(Individual and Class Claim)

111. Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as though set forth fully and at length herein, and adds:

112. In the United States, common law generally identifies nine elements needed to establish fraud: (1) a representation of fact; (2) its falsity; (3) its materiality; (4) the representer's knowledge of its falsity or ignorance of its truth; (5) the representer's intent that it should be acted upon by the person in the manner reasonably contemplated; (6) the injured party's ignorance of its falsity; (7) the injured party's reliance on its truth; (8) the injured party's right to rely thereon; and (9) the injured party's consequent and proximate injury.

113. Here, Wells Fargo has provided numerous written statements outlining reasons for denying the Class Members loan modification applications.

114. Here, Wells Fargo's written statements were false and misleading as to the purported restrictions that prevented modification of the Class Members mortgages. As more fully outlined in this Complaint, Wells Fargo has modified mortgages governed by the same governing documents that it claims restrict the manner I which they can modify a Class Member's mortgage. Upon information and belief, Wells Fargo has purposefully misrepresented the "restrictions" and failed to disclose governing documents that permit modification of the Class Member's mortgages. These false representations were material in nature as they concealed the fact that a viable loan modification solution was always available to the Class Members.

115. Wells Fargo was well aware of the fact that it had modified other mortgages in the same pools of loans that contain the Class Members' mortgages in a manner inconsistent with the "restrictions" Wells Fargo used to deny Class Members loan modification applications.

116. Here, Class Members were unaware of the fact that Wells Fargo was misrepresenting the "restrictions" that prevented modification of the Class Members' mortgages.

117. Here, each of the Class Members relied on Wells Fargo's misrepresentations along with Wells Fargo's acceleration of the entire debt and the resulting cessation of the Class Members rights to make monthly installment payments thereafter. Here, Class Members by applying for loan modifications demonstrated that they were ready, willing and able to resume making monthly payments, but Class members were prevented from doing so, while the interest, fees and escrow balance continued to accrue while Wells Fargo misrepresented the "restrictions" to the Class Members.

118. Here, Class Members had a right to rely on Wells Fargo's representations and believed that Wells Fargo, a Federally regulated National Association was being truthful pursuant to its obligations to good faith and fair dealing under the law.

119. As a result of Wells Fargo's misrepresentations, the Class members have been injured by loss of equity and accrual of interest, fees and escrow balances.

120. Class Members have been injured by Wells Fargo's delays which have prolonged the amount of time that their mortgages are reported late on their credit reports thereby preventing the Class Members from being able to solve their problems and move on with their lives.

121. Class Members have been injured by the torment and mental anguish resulting from the prolonged threat of losing their homes, when in reality a viable loan modification solution was always available but for Wells Fargo's misrepresentations.

122. Here, Defendant has purposefully and knowingly misrepresented the terms under which it can modify the Plaintiffs' mortgages, without Plaintiff's knowledge, which is a material misrepresentation, with the intent to cause Plaintiffs to act on said misrepresentation, which the Plaintiffs rightfully relied upon to their detriment in the form of late fees, attorneys' fees, an increased principal balance on the mortgages and accrued interest thereon, and the loss of equity resulting from the fraudulent conduct of Defendant

## COUNT V – DECEPTIVE ACTS AND PRACTICES
## VIOLATIVE OF NY CLS GEN BUS § 349
(Individual and Class Claim)

123. Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as though set forth fully and at length herein, and adds:

124. Under CLS Gen Bus § 349, plaintiff must prove that challenged act or practice was consumer-oriented, that it was materially misleading, and that plaintiff was injured as result thereof.

*Stutman v Chemical Bank*, 95 N.Y.2d 24, 709 N.Y.S.2d 892, 731 N.E.2d 608, 2000 N.Y.

LEXIS 910 (N.Y. 2000).

125. Here, Defendant has purposefully and knowingly misrepresented the terms under which it can

modify the Plaintiffs' mortgages, which is a consumer-oriented and material misrepresentation,

and Plaintiffs were injured as a result thereof in the form of late fees, attorneys' fees, an

increased principal balance on the mortgages and accrued interest thereon, and the loss of

equity resulting from the fraudulent conduct of Defendant.

**WHEREFORE**, Named Plaintiffs pray this Court will issue an order granting judgment against

Wells Fargo Bank, N.A. for its violations of NY CLS GEN BUS § 349; for actual, treble,

exemplary and punitive damages, attorney's fees and costs and injunctive relief; and any further

relief this Court deems appropriate.

### COUNT V -- VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT (15 U.S.C. §1691(d))
(Individual and Class Claim)

126. Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as

though set forth fully and at length herein, and adds:

127. Mr. & Mrs. Olivo and Catherine Sobers and Class Members are "applicants" as governed by
ECOA, 15 U.S.C §1691a(b).

128. Wells Fargo is a "creditor" as governed and defined by ECOA, 15 U.S.C. §1691(a)(e) at

all times relevant hereto.

129. 15 U.S.C §1691(d)(1) provides that "within thirty days…after receipt of a completed

application for credit, a creditor shall notify the applicant of its action on the application."

130. The accompanying Regulation B, issued by the Board of Governors of the Federal Reserve

System pursuant to ECOA, further provides: "A creditor shall notify an applicant of action

taken within: (i) 30 days after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application." 12 C.F.R §202.9(a)(1)(i).

131. Additionally, 15 U.S.C. §1691(d)(2) requires "that each applicant against whom "adverse action" is taken shall be entitled to a statement of reason for such action from the creditor." 15 U.S.C. §1691(d)(2).

132. 15 U.S.C. §1691(d)(6) defines "adverse action" as a denial or revocation of "credit", a change in terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or substantially the terms requested." 15 U.S.C. §1691(d)(6)

133. The term "credit" means the right granted by a debtor to defer payment of a debt or to incur debts and defer its payment…and defer payment thereof. 15 U.S.C. § 1691a (d); 12 C.F.R. §202.2(j).

134. The applications for modifications of their loan terms by the Named Plaintiffs and Class Members were applications for "credit" as defined by 15 U.S.C. § 1691a(d) and 12 C.F.R. §202.2(j).

135. Named Plaintiffs and Class Members provided Wells Fargo with completed applications for credit.

136. Wells Fargo failed to evaluate the Named Plaintiffs and the Class Members' loan modification requests in good faith and a make a reasonable determination on the applications after receiving the completed loan modification applications.

137. Instead, Wells Fargo grossly misrepresented its reasons for denial in its response to the Olivos, Ms. Sobers and the Class' loss mitigation requests as required by New York law and related federal guidance and standards described herein, and proceeded to threaten or engage in illegal foreclosure actions.

138. Wells Fargo's written denials are misleading, insufficiently specific and/or excessively vague, and as such, are in direct contravention of the Equal Credit Opportunity Act (ECOA), 15 USCS §§ 1691 et seq.

139. In failing to evaluate the Class applications for credit in a manner required by the federal and state regulations, Wells Fargo effectively denied the Class credit, and thereby took "adverse action" – as defined by ECOA – on the Class Member's applications.

140. The Plaintiffs Class never received a notice containing truthful and sufficiently specific statements of written reasons for denial from Wells Fargo or anyone else of the adverse action taken on their applications for loan modifications. Instead the Class was lied to by Wells Fargo about the reason their application for loan modifications were denied.

141. The above failure of Wells Fargo to truthfully with sufficient specificity notify the Class of the adverse actions taken on their application within thirty days from receipt of their completed application for credit as mandated by 15 U.S.C §1691(d)(1), §1691(d)(2) and 12 C.F.R §202.9(a)(1)(i) was a substantive violation of ECOA.

142. Without further specificity and disclosure the Class Members cannot adequately identify the level of discrimination employed by Wells Fargo, as such the Class reserves its right to amend its complaint after disclosure and discovery.

143. As a result of the above ECOA violations, the Class has suffered substantial actual damages in the following:

    a    the loss of the Plaintiffs Class' rights to explain or quickly rectify and address any errors or problems in their applications for credit;

    b    the accrual of interest and assessment of extra fees and charges by Wells Fargo that accrued due to its delays in responding the Plaintiffs Class' requests for credit;

    c    the loss of the credit itself; and

      d    frustration, anger, humiliation, fear, embarrassment and other emotional and mental anguish.

144. As a result of the above alleged ECOA violations, Wells Fargo is liable to the Named Plaintiffs and the Plaintiff Class for actual damages pursuant to 15 U.S.C. §1691(e)(a), for punitive damages against Wells Fargo pursuant to 15 U.S.C. §1691e(b) and for attorneys' fees and costs pursuant to 15 U.S.C. §1691(e)(d) and 12 C.F.R. §202.16(b).

145. As such, Plaintiffs respectfully request relief substantially similar to that requested herein.

**WHEREFORE**, Named Plaintiffs pray this Court to award the following relief against Wells Fargo for its violations of ECOA:

    a.    Actual damages as described in the Complaint above in a sum of no less than $20,000 per Plaintiffs' Class Member pursuant to 15 U.S.C. §1691 (e)(a).

    b.    Punitive Damages in the amount of $500,000 against Wells Fargo pursuant to 15 U.S.C. §1691e(b).

    b    Attorneys' fees and costs pursuant to 15 U.S.C. § 1691e (d).

    c    The Plaintiffs' Class and Named Plaintiffs are also entitled to equitable relief pursuant to 15 U.S.C. § 1691e (c) and Fed.R.Civ.P. 23 against Wells Fargo Bank, N.A. and asks this Court to: (i) enter an Order declaring that Wells Fargo's conduct is a violation of ECOA, insofar as it failed to provide a notice containing truthful statements of written reasons for denial to Named Plaintiffs and Class of its actions on their applications for a modification or change in credit within thirty day from receipt of the Class' applications for credit to modify their mortgage loans; and (ii) require delivery of ECOA Complaint notices in all future instances.

**JURY DEMAND**

146.  Plaintiff demands trial by jury.

**PRAYER**

**WHEREFORE**, Plaintiffs pray that this Court will issue an Order granting the following:

a.   The Court certify the Class and appoint the Named Plaintiffs as class representative and their counsel as Class Counsel;

a    The above referenced relief requested;

b    Actual damages;

c    Statutory damages;

d    Treble, exemplary and punitive damages;

e    Attorney's fees and expenses;

f    Costs of court;

g    Prejudgment and post-judgment interest as allowed by law;

h    Costs of suit;

i    General relief;

j    An injunction preventing Defendant from engaging in similar unlawful conduct now and in the future;

k    All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.


Respectfully Submitted,

Brian McCaffrey Attorney at Law, P.C.

/s/ Brian McCaffrey
 Brian McCaffrey, Esq.
 88-18 Sutphin Blvd.
 Jamaica, NY 11435
 Tel: 718-480-8280
 Fax: 718-480-8279
 Email: info@mynylawfirm.com