

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
JUAN OLIVO, ANA J. OLIVO, and
CATHERINE SOBERS, *on their behalf and on
behalf of a class of persons similarly situated*,

                    Plaintiffs,

        - against –

WELLS FARGO BANK, N.A.,

                    Defendant.
------------------------------------------------------------ X

**<u>MEMORANDUM
DECISION AND ORDER</u>**
18-CV-3222 (AMD) (LB)

ANN M. DONNELLY, United States District Judge:

On June 1, 2018, plaintiffs Juan Olivo, Ana J. Olivo, and Catherine Sobers brought this class action against Wells Fargo Bank, N.A., alleging a breach of the implied covenant of good faith and fair dealing, fraud, and violations of the New York Deceptive Practices Act, and the Equal Credit Opportunity Act.[1] Wells Fargo moves to dismiss the plaintiffs' complaint for failure to state a claim. (ECF No. 18.) For the following reasons, the defendant's motion is granted.

## BACKGROUND[*]

### I. Juan and Ana J. Olivo

In May of 2006, Juan and Ana Olivo took out a mortgage to purchase a home at 96

---

[1] At the July 24, 2018 pre-motion conference, the plaintiffs agreed to withdraw their federal breach of implied covenant of good faith claim. (*See* July 24, 2018 Minute Entry.)

[*] At the motion to dismiss stage, the court is limited "to the factual allegations in [the] . . . complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 180 (2d Cir. 2014) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). A "court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (internal quotation marks omitted)). I, therefore, take judicial notice of the court documents

1

Queen Street, Staten Island, NY 10314. (ECF No. 1 at 2–3.) CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-9 trust (the "CSMC Trust") held the Olivos' mortgage note, and Wells Fargo acted the CSMC Trust's servicer. (*Id.* at 6–7.) In early 2008, due to a reduction in Mr. Olivo's pay, the Olivos "struggled to pay their $4,452.40 mortgage payment;" they contacted Wells Fargo seeking a loan modification, and were told that they would need to stop making payments to qualify for a loan modification. (*Id.* at 3–4.) According to the plaintiffs, the Olivos followed Wells Fargo's instruction, stopped making payments, and then applied for a loan modification. (*Id.* at 4.) Wells Fargo denied that request, as well as the Olivos' subsequent requests for loan modifications. (*Id.*) The plaintiffs claim that "Wells Fargo's reason[s] for denial have been a moving target and changed over time depending on the programs that were available." (*Id.*)

On July 11, 2008, the CSMC Trust, through its trustee US Bank National Association, commenced foreclosure proceedings in Richmond County Supreme Court (Index No. 103005/2008),[2] and on August 17, 2009, Judge Philip G. Minardo entered a default judgment of foreclosure and sale that found Ana Olivo liable to the CSMC Trust for $606,953.19, in addition to continuing accrual amounts, and directed that the property be sold at public auction.[3] (ECF No. 1 at 4; ECF No. 12-2 at 3.)

On October 2, 2015, Ana Olivo filed a Chapter 7 bankruptcy petition in Bankruptcy Court for the Eastern District of New York (Case No. 15-44518). (ECF No. 1 at 4.) During the

---

(ECF Nos. 12-2–12-23, 18-3–18-7) attached to the defendant's filings, but do not consider the defendant's declarations (ECF Nos. 12-1, 18-2) because the plaintiff did not rely on or know of them when they drafted the complaint.

[2] In the complaint, the plaintiffs allege incorrectly that Wells Fargo initiated foreclosure proceedings against the Olivos. (ECF No. 1 at 4.)

[3] The foreclosure auction was ultimately scheduled for June 7, 2018. (ECF No. 1 at 4.)

pendency of that proceeding, Ms. Olivo applied for loss mitigation and for another loan modification. (ECF No. 1 at 4.) Wells Fargo denied her application to modify the loan, explaining that it could not "reduce the interest rate on a fixed rate note" under paragraph 3.05 of the Pooling and Servicing Agreement that governed the CSMC Trust. (*Id.*; ECF No. 12-11 at 2–3.) Wells Fargo further explained that under both Tier 1 and Tier 2 of the Home Affordable Modification Program ("HAMP")[4] as well as non-HAMP modification review, the Olivos' loan was not eligible for modification. (ECF No. 12-11 at 3–4.) On July 13, 2016, Ms. Olivo moved for discovery regarding Wells Fargo's denial of her loan modification application, which the Bankruptcy Court denied. (ECF Nos. 12-12, 12-13.) The Bankruptcy Court terminated loss mitigation proceedings on December 13, 2016 (ECF No. 12-14), and closed the case on February 8, 2017, *In re Ana Olivo*, No. 15-44518, Dkt. No. 55 (Bankr. E.D.N.Y. Feb. 8, 2017).

On April 28, 2017, Ana Olivo commenced another bankruptcy proceeding, and again applied for loss mitigation and loan modification, but Wells Fargo denied the loan modification request; the Bankruptcy Court terminated loss mitigation proceedings in February of 2018 and dismissed the petition on March 22, 2018. *In re Ana Olivo*, No. 17-42163, Dkt. Nos. 1, 12, 47 (Bankr. E.D.N.Y. Feb. 8, 2017).

## II. Catherine Sobers

On July 26, 2006, Catherine Sobers took out a mortgage to purchase a home located at 114-09 27th Street, Cambria Heights, NY 11411. (ECF No. 1 at 2, 9.) The Wells Fargo Asset Securities Corporation, Mortgage Pass-Through Certificates, Series 2006-15 ("WFASC Trust")

---

[4] "In very general terms, the federal Home Affordable Modification Program ("HAMP") is a program that was conceived during the financial crisis as a part of the broader Troubled Asset Relief Program. Under HAMP, certain mortgage lenders and servicers contracted with the federal government to modify qualified borrowers' home loan mortgages to reduce borrowers' monthly mortgage payments." *Pandit v. Saxon Mortg. Servs., Inc.*, No. 11–CV–3935, 2012 WL 4174888, at *1 (E.D.N.Y. Sept. 17, 2012).

acquired Ms. Sobers' mortgage note; Wells Fargo serviced the WFASC Trust. (ECF No. 1 at 10, 12–13.) In 2008, Ms. Sober could not pay her monthly mortgage amount of $2,764.13, and sought a loan modification from Wells Fargo. (*Id.* at 9.) Wells Fargo granted her a loan modification under HAMP that required her to make three trial payments of $2,375.74, and allegedly told her that once they received the three payments, her loan would be permanently modified. (*Id.*) Ms. Sobers made the three payments in September, October and November of 2009, but did not receive permanent modification on her loan. (*Id.*) Ms. Sobers claims that she has submitted more than six loan modification applications, none of which Wells Fargo granted. (*Id.*)

On April 23, 2013, the WFACS Trust, through its trustee HSBC Bank USA, National Association, commenced foreclosure proceedings in the New York State Supreme Court, Queens County (Index No. 8084/2013). (*Id.*) In an order dated September 26, 2013, the court observed that attempts to settle the action had failed because Ms. Sobers was "unable to qualify for modification due to [her] income," and her loan was a mortgage backed security loan. (ECF No. 12-7 at 1.) On June 1, 2016, it entered the final judgment of foreclosure and sale; the court held that Ms. Sobers was liable to the WFCAS Trust for $529,574.32, in addition to continuing accrual amounts, and directed that the property be sold at public auction. (ECF No. 12-10 at 2.)

On March 23, 2017, Ms. Sobers filed a Chapter 13 bankruptcy petition in Bankruptcy Court for the Eastern District of New York (Case No. 17-41342). (ECF No. 1 at 10.) As part of the bankruptcy proceeding, Ms. Sobers applied for loss mitigation and another loan modification. (*Id.*) According to the plaintiff, Wells Fargo denied her application, but told her that it could offer her a "piggy-back modification," which would take interest payments on up to 12 missed mortgage payments and add that amount to the principal balance of the loan. (*Id.*) Under this

plan, Ms. Sobers would be required to make all other payments beyond the 12 payments covered by the modification.[5] (ECF No. 1 at 10.) The Bankruptcy Court terminated loss mitigation proceedings on February 26, 2018, and dismissed the bankruptcy case on April 12, 2018. (ECF Nos. 12-22–12-23.)

### III. Procedural History

The plaintiffs brought this class action on June 1, 2018, alleging that the defendant misrepresented the purported restrictions on its ability to modify their loan, and that the defendant has modified other loans governed by the same Pooling and Servicing Agreement. (ECF No. 1 at 5–6, 11–12.) The plaintiffs also allege that the defendant "ran out the clock" on any HAMP modification to which they would be entitled to, by failing to agree to a loan modification before the program's December 31, 2016 expiration. (*Id.* at 6, 12.) The plaintiffs assert that the defendant's representations led them to believe that they could not obtain a loan modification and as a result, their interest accrued and amounts owed on their mortgages increased. (*Id.* at 8, 14.)

On June 4, 2018, the plaintiffs moved for an emergency temporary restraining order to stay the auction of the plaintiffs' properties (ECF No. 5); two days later, I heard the motion, granted the temporary restraining order, and scheduled a preliminary injunction hearing (June 6, 2018 Minute Entry and Order). On June 20, 2018, after a hearing, I denied the plaintiffs' motion for a preliminary injunction (June 20, 2018 Minute Entry), and on August 23, 2018, the defendant moved to dismiss the complaint (ECF No. 18).

### DISCUSSION

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to

---

[5] The complaint does not state whether Ms. Sobers accepted or declined the "piggy-back modification."

5

relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This means that it must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While it does not require "detailed factual allegations," this standard requires more than "a formulaic recitation of the elements of a cause of action" and more than an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). In deciding a Rule 12(b)(6) motion to dismiss, the Court "must accept as true all of the allegations contained in the complaint;" however, this tenet does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678 (internal citations omitted).

The defendant moves to dismiss the complaint in its entirety; for the reasons discussed below, the defendants' motion is granted.

## I. Breach of the Implied Covenant of Good Faith and Fair Dealing

A claim for breach of the implied covenant of good faith and fair dealing "may be brought, if at all, only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain." *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 425 (S.D.N.Y. 2007) (quoting *Sauer v. Xerox Corp.*, 95 F. Supp. 2d 125, 132 (W.D.N.Y. 2000)). Under the implied covenant, "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . . For this to occur, a party's action must directly violate an obligation that may be presumed to have been intended by the parties." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407–08 (2d Cir. 2006) (internal quotation marks and citation omitted). The implied covenant of good faith and fair dealing "does not add

to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005) (internal quotation marks and citations omitted).

To invoke the covenant, "a plaintiff must identify sufficiently the contract allegedly breached," *MMZ Assocs., Inc. v. Gelco Corp.*, No. 06–CV–3414, 2006 WL 3531429, at *3 (S.D.N.Y. Dec. 8, 2006) (internal quotation marks and citations omitted), as "[t]he covenant of good faith and fair dealing is an implied duty that each party to a contract owes its contracting partner," *Gorbaty v. Wells Fargo Bank, N.A.*, No. 10–CV–3291, 2012 WL 1372260, at *19 (E.D.N.Y. Apr. 18, 2012). If a plaintiff cannot allege a contract between the plaintiff and the defendant, his implied covenant of good faith and fair dealing claim fails. *Pandit*, 2012 WL 4174888, at *5.

The complaint, in this case, does not sufficiently identify a contract from which the alleged implied covenant derives. The plaintiffs merely state that Wells Fargo breached the implied covenant because it "purposefully misrepresented the terms under which it can modify the Plaintiffs' mortgage" (ECF No. 1 at 20), and was required, but did not, "timely, truthfully, and accurately disclose the results of any" loss mitigation requests (ECF No. 19 at 15). The plaintiffs' breach of the implied covenant can be dismissed on this ground alone.

Even if I consider the only specific agreements mentioned in the complaint— the servicing agreements and the plaintiffs' individual mortgage notes—as the sources of the implied covenant, the claim still fails because the plaintiffs do not allege that these agreements bind both the plaintiffs and Wells Fargo. The plaintiffs do not claim that they are parties to the servicing agreements; therefore, they cannot enforce any implied covenant that would arise from these contracts. *Pandit*, 2012 WL 4174888, at *5 ("[T]he TPP was not a contract between Plaintiffs and Defendant, Plaintiffs' claim that Defendant breached the TPP's implied covenant of good

7

faith and fair dealing also fails."); *see Thomas v. JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 798 (S.D.N.Y. 2011) (The "plaintiffs were neither parties to the SPA nor intended third-party beneficiaries of that agreement; therefore, "they cannot enforce any covenant of that agreement, express or implied."); *Costigan v. CitiMortgage, Inc.*, No. 10–CV–8776, 2011 WL 3370397, at *8 (S.D.N.Y. Aug. 2, 2011) (same).

Similarly, the plaintiffs do not claim that Wells Fargo is the originator of or a party to their individual mortgage notes. Nor do they identify any provision in those contracts that requires the defendant to approve or even consider a loan modification application. Thus, the breach of the implied covenant claim cannot proceed on this theory, either. *See E. Sav. Bank v. Aufiero*, No. 14–CV–0256, 2016 WL 1056998, at *9 (E.D.N.Y. Mar. 14, 2016) ("[B]ecause there was no binding loan modification agreement or obligation to provide plaintiff with a modification agreement on his desired terms, defendant's claim of 'bad faith' or for breach of duty of good faith and fair dealing . . . fails as a matter of law.").

The complaint also alleges that an implied covenant could attach from Wells Fargo's "agreements with the United States Department of Treasury," "Designated Agreements, . . . [and] Consent Orders."[6] (ECF No. 1 at 11.) The defendant cannot be held liable for a breach of an implied covenant based on these agreements because the plaintiffs again do not claim that they are party to any of these agreements. *See Costigan*, 2011 WL 3370397, at *7 (rejecting "claims that Citi, by entering into the SPA and receiving funds under TARP from the

---

[6] In their opposition, the plaintiffs claim for the first time that Wells Fargo breached implied covenants that stemmed from agreements under "Consent Decrees" and "the National Mortgage Settlement." (ECF No. 19 at 14.) "It is well-settled that a plaintiff 'cannot amend [his] complaint by asserting new facts or theories for the first time in opposition to [a] motion to dismiss." *Peacock v. Suffolk Bus Corp.*, 100 F. Supp. 3d 225, 231 (E.D.N.Y. 2015) (internal quotation marks and citations omitted). I, therefore, do not address whether these agreements give rise to an implied covenant.

Department of the Treasury, covenanted, on behalf of itself and its subsidiaries to administer its contractual obligations with principles of good faith and fair dealing," because the plaintiffs were not parties to the agreement); *Thomas*, 811 F. Supp. 2d at 798 (same).

The complaint is devoid of any allegations that the plaintiffs had an enforceable contract with Wells Fargo that could create an implied covenant of good faith and fair dealing; accordingly, the plaintiffs' claim for breach of the implied covenant is dismissed.

## II. Fraud

The plaintiffs also bring fraud claims under New York and federal common law. (ECF No. 1 at 21–24.) "In order to state a claim for fraud under federal or New York state common law a plaintiff must allege that the defendant made a material false representation, that the defendant knew of the falsity (scienter), that the defendant acted with intent to defraud, that the plaintiff reasonably relied on the false representation, and damages." *Marcus v. AT&T Corp.*, 138 F.3d 46, 63 (2d Cir. 1998) (citations omitted).

A party alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The purpose of Rule 9(b) is to "(1) provid[e] a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protect[] a defendant from harm to his reputation or goodwill; and (3) reduc[e] the number of strike suits." *DiVittorio v. Equidyne Extractive Indus. Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). Under this heightened pleading standard, a plaintiff alleging fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Nakahata v. New York–Presbyterian Healthcare System, Inc.*, 723 F.3d 192, 197–98 (2d Cir. 2013) (citations omitted).

The plaintiffs have not pled their fraud claims with particularity. According to the

plaintiffs, Wells Fargo misrepresented the restrictions that applied to the Olivos' and Ms. Sobers' mortgages; specifically, the plaintiffs claim that Wells Fargo misled them when it "refused to modify the Olivo mortgage . . . cit[ing] ¶ 3.05 of the PSA," told the Olivos "that they would need to stop making payments in order to obtain a loan modification, and told Ms. Sobers that "once she made the three (3) trial payments her loan would be permanently modified" and that it could "only do a 'piggy-back modification.'" (ECF No. 1 at 4–5, 9–10.) But the complaint does not allege who at Wells Fargo made these alleged misstatements or when they were made. *See Arroyo v. PHH Mortg. Corp.*, No. 13–CV–2335, 2014 WL 2048384, at *10 (E.D.N.Y. May 19, 2014) (dismissing fraud claims where "the Amended Complaint include[d] some time frames," but left the court "to guess as to when certain other events occurred"); *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497, 526 (E.D.N.Y. 2011) ("[P]laintiffs' vague allegation that the alleged misstatements were made 'repeatedly' over the course of ten years is not sufficient under Rule 9(b) to state a claim for mail fraud.").

More important, the plaintiffs do not explain why these statements are fraudulent, but instead simply cite instances where Wells Fargo has granted loan modifications on other loans.[7] *See Miller v. HSBC Bank U.S.A., N.A.*, No. 13–CV–7500, 2015 WL 585589, at *7 (S.D.N.Y. Feb. 11, 2015) (dismissing fraud claim where "Miller [did] not identify individuals, dates or any factual context for the alleged misrepresentations and omissions by HSBC," or "the alleged omissions with any meaningful degree of specificity-broad categorical descriptions regarding 'opportunities for loan modifications.'"); *Altschuler v. Univ. of Pa. Law Sch.*, No. 95–CV–249, 1997 WL 129394, at *15 (S.D.N.Y. Mar. 21, 1997), *aff'd*, 201 F.3d 430 (2d Cir. 1999).

---

[7] The plaintiffs do not allege that Wells Fargo has granted loan modifications in situations analogous to the plaintiffs'; they simply allege fraud because Wells Fargo agreed to modify "a substantial number of loans" held by the CSMC and WFACS Trusts.

The plaintiffs' failure to plead the alleged fraudulent misstatements with specificity is fatal to their claims; the plaintiffs' state and federal law fraud claims are dismissed.

### III. New York Deceptive Practices Act

The plaintiffs also claim that Wells Fargo violated the New York Deceptive Practices Act, which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]." N.Y. Gen. Bus. Law § 349(a). To state a cause of action under the Deceptive Practices Act, a plaintiff must allege that "(1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (citation omitted).

"The gravamen of a § 349 claim is that the offending act or practice be directed 'against the consuming public,' and not a 'single-shot transaction.'" *Gorbaty v. Wells Fargo Bank, N.A.*, No. 10–CV–3291, 2014 WL 4742509, at *15 (E.D.N.Y. Sept. 23, 2014) (quoting *Silverman v. Household Fin. Realty Corp. of New York*, No. 12–CV–3559, 2013 WL 4039381, at *2 (E.D.N.Y. Aug. 5, 2013) (citations omitted)); *see also Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995). Therefore, "private contractual disputes which are unique to the parties do not fall within the ambit of the statute." *Gorbaty*, 2014 WL 4742509, at *15 (quoting *Yellow Book Sales & Dist. Co., Inc. v. Hillside Van Lines, Inc.*, 98 A.D.3d 663, 665 (2d Dep't 2012)). "The critical question is whether 'the acts or practices have a broad [] impact on consumers at large.'" *Kilgore v. Ocwen Loan Servicing, LLC*, 89 F. Supp. 3d 526, 535 (E.D.N.Y. 2015) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (1995)). Specifically, consumer-oriented conduct is "conduct that potentially affects similarly situated consumers." *Kapsis v. Am. Home Mortg. Servicing Inc.*,

923 F. Supp. 2d 430, 449 (E.D.N.Y. 2013) (internal quotation marks and citation omitted). "To satisfy this requirement in the context of a real estate transaction, courts have generally required that a plaintiff allege that the defendant affirmatively and publicly sought transactions with consumers." *Hayrioglu v. Granite Capital Funding, LLC*, 794 F. Supp. 2d 405, 410 (E.D.N.Y. 2011) (collecting cases).

The plaintiffs have not adequately pled that Wells Fargo's allegedly deceptive conduct was "consumer-oriented" or that Wells Fargo affirmatively "sought transactions with consumers" as required by § 349(a). The plaintiffs' claims stem from Wells Fargo's alleged misrepresentations about, and ultimate denials of, their individual loan modification requests. The plaintiffs do not allege that this conduct was directed at the public or that Wells Fargo had a misleading loan modification policy. *See Kilgore*, 89 F. Supp. 3d at 536 (Allegations of a "fraudulent modification program" that was allegedly "directed to hundreds of thousands of consumer-homeowners whose loans have been serviced by defendant" were "conclusory" and "insufficient to support a plausible Section 349 claim.") (internal quotation marks omitted); *Gorbaty*, 2014 WL 4742509, at *16 (Allegations were not "consumer-oriented" where they "derive[d] from the particular circumstances of [the plaintiff's] 'single shot' transactions with Wells Fargo," specifically the defendant's "denial of Gorbaty's applications for loan modification"); *cf. Pandit*, 2012 WL 4174888, at *6 (Allegations that the defendant "routinely ask[ed] homeowners to resubmit financial information on pretextual grounds; [misled] homeowners over the phone; and ignore[d] completed loan modifications" were sufficiently "consumer oriented" under § 349) (internal citations omitted).

The plaintiffs' allegations relate to their individual mortgages, and do not suggest that Wells Fargo's "acts or practices ha[d] a broader impact on consumers." *Oswego*, 85 N.Y.2d at

25. The plaintiffs' Deceptive Practices Act claim is dismissed.[8]

## IV. Equal Credit Opportunity Act (ECOA)

Finally, the plaintiffs allege that the defendant violated the ECOA, specifically 15 U.S.C. § 1691(d) and 12 C.F.R. § 202.9, when it denied their loan modification requests without providing them with "a statement of reasons" within thirty days after receiving the requests. The Equal Credit Opportunity Act "requires a creditor that takes 'adverse action' on a consumer credit application to provide a 'statement of reasons' for the adverse action." *Pandit*, 2012 WL 4174888, at *7 (citation omitted). The ECOA defines an "adverse action" as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested;" an "adverse action," however, does "not include a refusal to extend additional credit under an existing credit arrangement *where the applicant is delinquent or otherwise in default.*" 15 U.S.C. § 1691(d)(6) (emphasis added).

As the complaint states, the Olivos' loan modification requests—with the exception of their initial inquiry seeking modification in "early 2008"[9]—were made after the Olivos

---

[8] The plaintiffs cite two cases for the proposition that they alleged "consumer-oriented" conduct, but neither case is applicable. (ECF No. 19 at 19–20.) In *Gaidon v. Guardian Life Ins. Co. of Am.*, the Court of Appeals held that allegations of the defendants' marketing of insurance to "lure[] the purchaser into falsely believing that no additional premiums need be paid after a certain period of time" was sufficiently "consumer-oriented," because it involved an "extensive marketing scheme that had a broader impact on consumers at large." 94 N.Y.2d 330, 331 (1999). Likewise, in *Small v. Lorillard Tobacco Co.*, the Appellate Division found that tobacco manufacturers' public statements "consistently den[ying] that nicotine was addictive," while having "the express intention of designing products so addictive that people would be unable to stop buying them" were misrepresentations plainly directed at the consuming public. 252 A.D.2d 1, 5 (1st Dep't 1998), *aff'd*, 94 N.Y.2d 43 (1999). The plaintiffs do not allege that Wells Fargo engaged in any broad marketing scheme or public misrepresentations; their allegations pertain solely to their individual mortgage loans and loan modifications.

[9] The plaintiffs do not appear to dispute that the Olivos were in default when they made their initial loan modification request. (*See* ECF No. 19 at 20.) However, on the face of the complaint, it is not clear whether they actually were in default when they made their first request in early 2008 or whether they defaulted only after Wells Fargo informed them that "they would need to stop making payments in order

13

defaulted, and thus, do not trigger the ECOA's adverse action "statement of reasons" requirement. *See Green-Stevenson v. Bank of Am., N.A.*, No. 13–CV–2408, 2014 WL 11474837, at *1 (E.D.N.Y. Jan. 15, 2014), *aff'd sub nom. Stevenson v. Bank of Am., N.A.*, 597 F. App'x 4 (2d Cir. 2015) ("ECOA claims fail because plaintiffs were in default when they sought loan modifications, in which case the statute does not apply."). Likewise, Ms. Sobers requested loan modifications only after she had already engaged in trial payments and was in default; these requests do not fall within the ambit of the ECOA. *See Pandit*, 2012 WL 4174888, at *7 ("[I]n making reduced payments during the Trial Period, Plaintiffs were in default on their mortgage for the purposes of the ECOA.").

For these reasons, the plaintiffs' ECOA claim is dismissed.

## CONCLUSION

Accordingly, the defendant's motion to dismiss is granted; and the complaint is dismissed without prejudice.[10] If the plaintiff chooses to file an amended complaint, it must cure the deficiencies discussed in this decision and be filed within 30 days from the entry of this Order, or the case will be closed.

---

to obtain a loan modification." (ECF No. 1 at 4.) It ultimately does not matter, because the plaintiffs have not adequately pled that the defendant's response was insufficient under the ECOA.

[10] Although the defendant seeks dismissal with prejudice (ECF No. 18-1 at 22), I cannot determine on this record that leave to amend is futile. *See City of Pontiac Gen. Employees' Ret. Sys. v. MBIA Inc.*, 300 F. App'x 33, 34 (2d Cir. 2008) (summary order) (A court "should freely give leave [to amend] when justice so requires." (quoting Fed. R. Civ. P 15(a)(2)); *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 199 (2d Cir. 1990) (The district court abused its discretion by denying leave to amend where no leave to amend was previously given, and the panel could not determine on the basis of the record that leave to amend was futile.).

**SO ORDERED.**

                                                s/Ann M. Donnelly
                                      _____
                                      Ann M. Donnelly
                                      United States District Judge

Dated: Brooklyn, New York
        March 29, 2019